J-S14011-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MARK THOMAS WARD BOISEY | : | |
| | : | |
| Appellant | : | No. 764 MDA 2023 |

Appeal from the Judgment of Sentence Entered February 7, 2023
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s):  CP-21-CR-0003408-2019

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY LAZARUS, P.J.:          **FILED: MAY 30, 2024**

Mark Thomas Ward Boisey appeals from the judgment of sentence, entered in the Court of Common Pleas of Cumberland County, following a jury trial in which he was convicted of four counts of aggravated assault,[1] three counts of assault of a law enforcement officer,[2] two counts of attempted homicide,[3] and one count each of strangulation,[4] discharge of a firearm into

---

[1] 18 Pa.C.S.A. § 2702(a)(1).  Boisey was charged with one count of aggravated assault each with respect to his actions against Boisey's ex-girlfriend, Emily Tolle, and Officers Cody Vickroy, Bryan Rennie, and Nicole Boldosser.  The jury found Boisey guilty of all four counts.

[2] *Id.* at § 2702.1(a).  The jury found Boisey guilty on these counts with regard to Officers Vickroy, Rennie, and Boldosser.  The jury found Boisey not guilty with respect to this charge as it applied to Officer Torrie Shiley.

[3] *Id.* at § 2501(a); *id.* at § 901(a).  The two counts were regarding Tolle and any officer at the scene.

[4] *Id.* at § 2718(a)(1).

an occupied structure,[5] recklessly endangering another person (REAP),[6] and terroristic threats.[7] After careful review, we affirm.

The trial court summarized the underlying facts of this case as follows:

On November 12, 2019, [] Tolle had ended her relationship with [Boisey]. [Tolle] planned to move out of their home at 529 Terrace Drive in New Cumberland over the next few days. As she packed up some of her belongings, [Boisey] began to drink. He became belligerent with Tolle throughout the day. After drinking for nearly 6 hours, [Boisey] left the house around 6:00[] PM.

While [Boisey] was out of the house, Tolle tried to leave in her vehicle. She found that it had been disabled. At that same time, [Tolle] was receiving text messages from [Boisey] stating[] that he would hunt her down if she left. Fearing what [Boisey] might do, she called the police. Since [Boisey] resided in the home, the police told [Tolle] that they could not stop [Boisey] from returning.

Tolle's worries were soon put to rest, however, after she received a text message from [Boisey] stating that he did not want any conflict. She thought he was coming to terms with their breakup. She locked up the house and eventually fell asleep.

Tolle was suddenly awakened by loud cracks and a boom, presumably made by [Boisey] as he entered the bedroom. [Boisey] grabbed [Tolle] tightly by the hair and said, "I'll give you a reason to call the police!" [Tolle] kept screaming for him to stop.

At some point, [Boisey] pulled a gun, cocked it, and fired it in the room. Then[,] he placed the barrel against Tolle's head. [Boisey] proceeded to strike [Tolle] with the gun, knocking her to the ground. The gun fell from [Boisey's] hand and the two began to struggle over it. [Boisey] continued to punch [Tolle] and twist her fingers until he regained control of the gun. Tolle covered her face with a blanket. [Boisey demanded,] "Look at me, Bitch![,]" as he

_____

[5] *Id.* at § 2702.1(a).

[6] *Id.* at § 2705.

[7] *Id.* at § 2706(a)(1).

pointed the gun at her. "You're going to look at me while I kill you!" [Tolle] looked at [Boisey]. All she could see was a gun in her face. [Tolle] pleaded for her life, begging him to let her go. But she could see that her pleas were fruitless.

[Tolle] decided to fight. She tackled [Boisey] to the ground. She broke free and ran down the hallway towards the front door. [Boisey] caught [Tolle] by her hair, slammed her up against the wall and began to strangle her. [Tolle] then jammed her palm upwards into his nose. It caused [Boisey] to release her, allowing her to bolt for the door. She made it outside.

Once outside, Tolle ran for the neighbor's house because she could see a light through the window. She banged and banged on the front door to no avail. Then, out of the corner of her eye, she saw the screen door to her home opening. She could see an arm extended through the doorway with a gun. [Boisey] started shooting. Fortunately, the neighbor's door was unlocked. She burst into the house screaming for help. She immediately started looking for a person or a phone to call the police.

As Tolle moved throughout the house, the windows began to shatter around her. She realized that [Boisey] was shooting at her. She [dropped] to the ground and began to crawl about the house in search of a phone. Her neighbor had come out of his bedroom and saw her crawling on the floor. He quickly dropped to the floor once he realized that someone was shooting into his home. He was able to get to his phone to call 9-1-1 for help.

Officer [Cody] Vickroy of the New Cumberland Police Department was dispatched shortly after his midnight shift had begun. He was told that a domestic incident had just occurred at 529 Terrace Drive[,] but that the victim was hiding inside the home of her neighbor at 527 Terrace Drive. He pulled up in a clearly marked patrol car and parked in front of the neighbor's home. He requested additional units and then approached the home to make contact with [Tolle].

Officer Vickroy made contact with the neighbor and Tolle at [the neighbor's] doorway. He stepped inside to speak with them. As he spoke with them, he began to hear popping noises. It sounded as if the pops were hitting off the walls of the house. He could see a bullet lying on the floor in front of him. Then he noticed additional bullets coming into the house. He could tell that the bullets were coming from the direction of [Boisey's] home.

Officer Vickroy directed Tolle and her neighbor to take cover in the back of the house. He then proceeded to leave the house with his gun drawn. As he did, he could hear Officer [Brian] Rennie yelling, "[s]hots fired!" Officer Vickroy quickly moved to take cover in a position around the corner of the home. As he moved into position, he heard continuous shots as [Boisey] fired at the officers.

Around that same time, Officers [Torrie] Shiley and Boldosser of the Upper Allen Township Police Department arrived on scene. They positioned themselves in front of the home at 529 Terrace Drive. By the end of the ordeal, numerous police units and a special response team from various police agencies responded.

As other officers from surrounding departments arrived on scene in clearly marked police vehicles, Officer Vickroy decided that it was time to attempt to remove Tolle and her neighbor from the house at 527 Terrace Drive. Despite the gunfire, he made his way back into the house to retrieve the pair.

[Boisey] seemed to focus his gunfire on the officers positioned to the front of 529 Terrace Drive. As he fired on those officers, Officer Vickroy, while shielding Tolle with his body, rushed her and her neighbor out of the home. He used the cover of darkness to hide as he moved them between the houses on their harrowing journey to safety. Once Tolle and her neighbor were safe, Officer Vickroy returned to 529 Terrace Drive where the shooting continued.

Officer Vickroy and the other officers continued their efforts to neutralize the threat. Numerous times throughout the incident, [Boisey] fired directly at the officers. Officers Vickroy, Boldosser, and Rennie all reported hearing the high-pitched hiss of the bullets as they came perilously close to their heads. Negotiators attempted to call [Boisey, but he] simply refused to surrender himself. As time went on, the gunfire from the home became more sporadic. After nearly 8 hours, the officers decided to end the stand-off by using the Special Response Team.

During a lull in the gunfire, the Special Response Team used an armored vehicle equipped with a battering ram to breach the door to 529 Terrace Drive. When the team members entered the house, they found [Boisey] lying in bed with empty shell casings and bullet packages strewn about the bedroom. The Special Response Team took him into custody without any resistance.

The evidence showed that [Boisey] fired dozens of rounds from his house. A multitude of those bullets were fired at 527 Terrace Drive, where Tolle and her neighbor had been. Many bullets entered the home through the walls and windows. One windowpane that did not shatter contained 8 distinct bullet holes.

Investigators also determined that [Boisey] shot in the direction of the police cars and other vehicles outside of the house. Two of the police vehicles were struck by several bullets. The officers not only used those vehicles to arrive on scene, but they used the vehicles as shields while [Boisey] [fired] upon them. Bullets struck the vehicles in the windshields and windows. [In particular[], the bullet impacts seemed focused in the area where the driver would sit.

Nearly every room of [Boisey's] house at 529 Terrace Drive held evidence of gunfire. Multiple magazines were found throughout the house. Live rounds and bullet casings littered the rooms and hallway. Thirteen casings were collected from the living room alone. Another eight were collected from the kitchen. More casings and live ammunition were found in the bedroom. The gun itself was located on the kitchen floor.

Trial Court Opinion, 9/27/23, at 2-9.

A jury trial was held over three days in December 2022. Following trial, Boisey was convicted of the above-stated offenses and sentenced, on February 7, 2023, to an aggregate term of incarceration of 20-40 years. Boisey filed timely a post-sentence motion challenging the sufficiency and weight of the evidence. Following argument, the trial court denied the motions. Boisey filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

On appeal, Boisey raises the following issues for our consideration:

(1)    Whether the evidence was sufficient to sustain [Boisey's] conviction of attempted homicide as to any of the officers?

(2)     Whether the evidence was sufficient to sustain [Boisey's] convictions of aggravated assault and assault of law enforcement officer as to any of the officers?

Appellant's Brief, at 5-6.

Both of Boisey's arguments on appeal concern the sufficiency of the evidence for several of his convictions. In reviewing the sufficiency of the evidence,

> we must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, were sufficient to prove every element of the offense beyond a reasonable doubt. [T]he facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. It is within the province of the fact-finder to determine the weight to be accorded to each witness's testimony and to believe all, part, or none of the evidence. The Commonwealth may sustain its burden of proving every element of the crime by means of wholly circumstantial evidence. Moreover, as an appellate court, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder.

***Commonwealth v. Williams***, 176 A.3d 298, 305-06 (Pa. Super. 2017) (citations omitted).

Boisey first argues that there was insufficient evidence to support his attempted murder convictions, as they relate to the police officers, "because the evidence failed to prove that [he] acted with the requisite *mens rea*, namely, specific intent to kill [where he] neither fired a weapon at [n]or aimed a weapon at the officers." Appellant's Brief, at 9.

Attempt is a separate inchoate crime codified at 18 Pa.C.S.A. § 901. Criminal attempt exists when "[a] person[,] with [the] intent to commit a specific crime, [] does any act which constitutes a substantial step toward the

commission of that crime." 18 Pa.C.S.A. § 901(a); *see also Commonwealth v. Palmer*, 192 A.3d 85, 88 (Pa. Super. 2018).

In order to prove attempted murder, the Commonwealth must establish specific intent to kill. *See Commonwealth v. Fortson*, 165 A.3d 10, 15 (Pa. Super. 2017). "[I]f a person takes a substantial step toward the commission of a killing, with the specific intent in mind to commit such an act, he may be convicted of attempted murder." *Id.* (citation omitted). The Commonwealth may prove specific intent to kill entirely through circumstantial evidence or through "[t]he use of a deadly weapon on a vital part of the body." *Id.* (citation omitted). *See also Commonwealth v. Ligon*, 206 A.3d 515, 519 (Pa. Super. 2019) (law permits fact-finder to infer one intends natural and probable consequences of his or her acts).

Here, the evidence showed that Boisey repeatedly fired shots at his neighbor's home, shattering windows and leaving spent bullets on the interior floors, all the while officers surrounded the home in an effort to neutralize the situation. Officers Vickroy, Rennie, and Boldosser each testified that they either felt or heard gunshots fly by them during the incident and feared for their lives. Several of these bullets lodged in the police vehicles behind which the officers attempted to shield themselves. *See* N.T. Jury Trial, Vol. I, 12/5/22, at 123 (Officer Vickroy testifying, "I'm not going to lie, turning the corner at the back of the home, I was so scared. It's probably the scariest situation I've ever been in on this career[. T]hat freaked me out."); *id.* at 122-23 (Officer Vickroy, standing in grassy area outside home, could "hear

rounds zip" by her); *id.* at 125 (Officer Vickroy testifying shots were "traveling toward us" and officers on scene had to take cover behind police cruisers because you "couldn't tell where the rounds were going"). *See also id.*, Vol. II, 12/6/22, at 8 (Officer Vickroy testifying "that's when I started hearing rounds coming past me" and "[y]ou could hear multiple rounds being shot, hitting off the side of the [Terrace Drive residence] and going in other directions"); *id.* at 9-11 (Officer Vickroy testifying, "the rounds were coming in my direction[, I would call it like rapid succession"); *id.* at 11 (Officer Vickroy stating shots were coming toward officers); *id.* at 112-13 (Officer Boldosser testifying she could tell shots "were being fired in [their] direction"). Under these facts, we conclude that there was sufficient circumstantial evidence to prove attempted murder with regard to the officers on the scene. *See Ligon*, *supra*.

As to Boisey's argument that he lacked the specific intent to kill the officers because he did not point the gun at them, it is well-established that it does not matter whether a defendant's intent was specific or generalized with respect to his target when he shot the gun. Rather, the critical factor is that he had a specific intent to kill *someone*. *See Palmer*, 192 A.3d at 89 (firing ten bullets at individual constituted substantial step toward commission of attempted homicide "if directed at a particular person").

In his final issue, Boisey argues that the evidence was insufficient to sustain his aggravated assault and assault of law enforcement officer convictions where the Commonwealth failed to prove he acted with the specific

intent to cause serious bodily injury to or harm the uninjured victims and where "[t]he . . . individuals[, other than Tolle,] were simply in the way when the shots were fired and not one of them was an intended victim." Appellant's Brief, at 9-10.[8]

To sustain a conviction for aggravated assault under subsection 2702(a)(1), the Commonwealth must prove that the defendant "attempt[ed] to cause serious bodily injury to another." 18 Pa.C.S.A. § 2702(a)(1). "For aggravated assault purposes, an 'attempt' is found where an accused who possesses the required[] specific intent acts in a manner which constitutes a substantial step toward perpetrating a serious bodily injury upon another." *Commonwealth v. Fortune*, 68 A.3d 980, 984 (Pa. Super. 2013) (en banc). Again, intent may be proven "through circumstantial evidence and inferred from acts, conduct[,] or attendant circumstances." *Id.* (citation omitted).

For the same reason that we conclude there was sufficient evidence to establish Boisey's specific intent to commit murder with regard to the officers, we likewise find that there was sufficient evidence, based upon a totality of the circumstances, to conclude that Boisey had the specific intent to commit aggravated assault on the officers where the circumstantial evidence clearly

_____

[8] Moreover, Boisey contends that the Commonwealth failed to prove transferred intent "because none of the victims named in the [a]ggravated [a]ssault bills was harmed." *Id.* at 10. However, transferred intent was not a theory argued by the Commonwealth or charged to the jury.

- 9 -

proved that Boisey repeatedly fired shots at them, in the line of duty, as they attempted to defuse the terrifying domestic dispute.

Similarly, we conclude that the evidence proved that Boisey committed the crime of assault of a law enforcement officer beyond a reasonable doubt. Pursuant to 18 Pa.C.S.A. § 2702.1(a)(1), a person is guilty of assault of a law enforcement officer, a first-degree felony, when he or she "attempts to cause or intentionally or knowingly causes bodily injury to a law enforcement officer, in the performance of duty and with knowledge that the victim is a law enforcement officer, by discharging a firearm." *Id.* Here, after the officers arrived on the scene in marked patrol cars in response to a police dispatch, Boisey repeatedly shot at uniformed police officers Vickroy, Rennie, and Boldosser and their marked vehicles, as the officers attempted to neutralize the dangerous situation. Thus, we conclude that the specific intent required for aggravated assault under subsections 2702(a)(1) and 2702.1(a)(1), were established beyond a reasonable doubt.

Judgment of sentence affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary


Date: 05/30/2024